## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ASHLEIGH AVVISATO,** | : | **Civil No.  1:23-CV-185** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,** | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

In 2019, Ashleigh Avvisato was on the threshold of her work life. At age 18, Avvisato was enrolled in college, studying graphic design. She maintained a strong grade point average, lived independently at college with some housing accommodations, exercised, was a DJ for college radio station, and traveled to Florida, New York, New Jersey, and France, albeit all with some assistance and accommodations.

Nonetheless, on August 16, 2019, Avvisato applied for disability benefits, asserting that she was completely and totally disabled due to the combined effects of an anxiety disorder, psychological conversion disorder, social phobia, congenital anteversion of her femur, and ataxia, a neurological condition which results in

1

impaired balance and coordination. In the course of agency proceedings, six different medical experts examined Avvisato's treatment records, medical history, and activities of daily living. Five of these six medical experts determined based upon this evaluation that Avvisato retained the ability to perform some work notwithstanding her emotional and physical impairments. The sole outlying medical source, Dr. Sallavanti, was a treating physician who opined that Avvisato was wholly disabled.

Upon consideration, the Administrative Law Judge (ALJ) assigned to Avvisato's case concluded, consistent with the medical opinion consensus and Avvisato's self-reported activities of daily living, that the plaintiff retained the ability to do some work. Avvisato has now appealed this agency determination, arguing that the ALJ erred as a matter of law in failing to adopt the extreme view of her disability expressed by Dr. Sallavanti.

In considering this claim we are reminded that the Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record

2

and asks whether it contains "sufficien[t] evidence" to support the
agency's factual determinations. Consolidated Edison Co. v. NLRB,
305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis
deleted). And whatever the meaning of "substantial" in other contexts,
the threshold for such evidentiary sufficiency is not high. Substantial
evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks
omitted). It means—and means only—"such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."
Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v.
Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)
(comparing the substantial-evidence standard to the deferential clearly-
erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

After a review of the record, and mindful of the fact that substantial evidence
"means only—'such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that
substantial evidence supported the ALJ's findings in this case. Therefore, for the
reasons set forth below, we will affirm the decision of the Commissioner denying
this claim.

## II.   **Statement of Facts and of the Case**

### A. **Background**

The administrative record of Avvisato's disability application reveals the
following essential facts: On August 16, 2019, Ashleigh Avvisato filed an
application for supplemental security income, alleging disability beginning May 18,

2001. (Tr. 32). According to Avvisato, she was completely disabled due to the combined effects of a series of physical and emotional impairments, including an anxiety disorder, psychological conversion disorder, social phobia, congenital anteversion of her femur, and ataxia, a neurological condition which results in impaired balance and coordination. (Tr. 34-35). Avvisato was 18 years old at the time of the alleged onset of her disability, making her a younger worker under the Commissioner's regulations. (Tr. 45). She had a high school education and was enrolled in college but had no prior work experience. (Id.)

### B. Avvisato's Clinical Record

With respect to Avvisato's reported impairments, the clinical record was equivocal and contradictory in some respects, but contained substantial evidence indicating that Avvisato could perform some work. On this score, the ALJ observed that:

> The record shows the claimant was diagnosed with a congenital anteversion of the femur and that when she was younger, her foot was turned inward (Exhibit 5F). [T]he record shows she has some gait abnormality, but notes she walks around campus, uses an elliptical to exercise, and while she sometimes trips, she reports that she never fallen [sic] (Exhibit 15F/p. 9-10). The claimant is diagnosed with anxiety state, social phobia, and conversion disorder. The record shows she has been treating with Dr. Berger since 2017, but her visits were reduced due to her being away at college. In January 2020, she was home from college and was seen by Dr. Berger's office. She reported that she was doing good, and her anxiety had been stable with a few

4

flare ups when dealing with a difficult roommate (Exhibit 9F/p. 5). She was noted to be cooperative and pleasant, she had good eye contact, her speech was soft and coherent, and her affect was appropriate and shy. Her thought processes were coherent and logical, her memory was intact, attention and concentration were normal, her judgment was intact, and insight was appropriate (Exhibit 9F/p. 7).

In a telephone visit in May 2020, she reported she finished off the school year online, and her anxiety was a little higher due to the pandemic, but she was doing well overall (Exhibit 9F/p. 1). All her future appointments were by telephone due to the COVID 19 pandemic. In November 2020, she reported that she was doing good (Exhibit 16F/p.5). She stated that she was in college, her grades were good, anxiety was controlled with medication with some flare ups where her mother reported that the claimant takes ¼ tablet of Klonopin (Exhibit 16F/p. 5). The claimant reported that she was involved with the school's radio as a DJ, and she enjoyed playing her music. Dr. Berger noted that her mental status exam findings showed she was alert and oriented, her speech was coherent and soft with no aphasia while speaking, and her thought processes were coherent and logical. Dr. Berger stated that her memory was intact, her attention and concentration were normal, and her judgment and insight were intact (Exhibit 16F/p. 7).

When she had a follow-up telephone visit in May 2021, the claimant reported she was good, that she did very well in school, her anxiety was under control and she had no panic attacks. Dr. Berger found her mental status exam findings to be the same as her November 2020 visit (Exhibit 16F/p. 3). The claimant reported that she was seeing a therapist on a monthly basis at some point but as of December 2019, she reported she sees her therapist every four months because she does not feel she needs a therapist (Exhibit 4F/p. 10).

The undersigned received a completed medical interrogatory from Natalie Litvinsky, MD (Exhibit 19F). Dr. Litvinsky noted that the claimant did not meet or equal a listing as there is no evidence that the claimant has a neurologic disorder. Dr. Litvinsky noted that the claimant follows with neurology for tremors and abnormal gait, she had

extensive workups, has seen multiple specialists and no etiology was found. Dr. Litvinsky stated that a diagnosis of conversion disorder is considered (Exhibit 5F/p. 42, 46, 52; 15F/p. 5). Dr. Litvinsky stated that her exam has functional findings and inconsistencies, and there are also contradictions in the history, such as endorsing struggling with standing and walking but doing light jogging (Exhibit 12F/p. 2; 15F/p. 4, 7). Dr. Litvinsky noted the claimant's MRI of the brain shows diffuse cerebellar atrophy and an arachnoid cyst, and Dr. Litvinsky stated that neither finding explains the claimant's symptoms.

The undersigned notes the treatment records from the claimant's primary care physician, Kathryn Sallavanti, DO, and from neurology at the Children's Hospital of Philadelphia (CHOP), are largely inconsistent. Dr. Sallavanti opines that the claimant has significant difficulty with writing, typing, daily activities, walking, sitting and standing. Dr. Sallavanti stated that the claimant's conditions, physical and mental, have deteriorated (Exhibit 8F). Dr. Sallavanti stated the claimant must use a cane for stability, her speech is affected, and she has difficulty with social interaction (Exhibit 8F/p. 3). Dr. Sallavanti stated that the physical exam findings show muscle weakness, 3/5 upper extremity proximal and distal strength, and lower extremity weakness making her unable to balance on one leg (Exhibit 8F/p. 4).

However, the treatment notes at CHOP show that while the claimant does have some difficulty with her gait, her tremors are noted to be intermittent, and her motor strength is noted to be normal 5/5 throughout. The CHOP records further reflect that the claimant walks all over campus and feels it has helped her a lot, exercises and uses the elliptical machine and started doing some light jogging. They also indicate that she uses a computer for school without difficulty, she types well, her handwriting is difficult, she struggles with drawings but is excellent with stuff on the computer, she is majoring in graphic design, she works as a DJ at her college radio station, and she reports no problems with fine motor skills. She noted that she struggles with standing and walking and that she has a wide stance when she stands. She stated that she does not have any issues with falling but does better when using a cane for support like when she went to New York. She

6

reports she has no problems with anxiety as it is controlled since she is on Buspar. Her MRI of the brain shows overall stable cerebellar atrophy (Exhibit 15F). Her physical exam findings at the CHOP are mostly normal with normal motor strength, normal muscle tone and bulk, some gait abnormalities, and some intermittent trembling of her body (Exhibit 15F/p. 7). The record notes that Benzodiazepines have been the only medication that has been helpful in controlling her tremors and ataxia, and that for the past 2-3 years she has been relatively stable (Exhibit 15F/p. 8). She declined to have genetic testing done to help understand the etiology of her ataxia and tremors.

Overall, the longitudinal evidence of record does not support the claimant's allegations concerning the intensity, persistence, and limiting effects of his symptoms. She complains of tremors and an abnormal gait and alleged it had worsened over the years. She has attended physical therapy, been evaluated by neurology and noted that the ataxia and tremors are exacerbated by anxiety and fatigue. She is diagnosed with anxiety, social phobia and conversion disorder and the record notes that when she is out of stressful situations, her tremors stop (Exhibit 15F/p. 10). Since beginning treatment with Dr. Berger, the claimant reports she is doing good, her anxiety is under control with medication, and she only has to use a ¼ tablet of Klonopin if she feels a flare up. Her mental status exam findings are relatively benign showing she is alert and oriented, her speech is coherent and soft with no aphasia while speaking, and her thought processes are coherent and logical. Her memory is intact, her attention and concentration are normal, and her judgment and insight are intact.

.

(Tr. 40-42).

## C. **Avvisato's Self-Reported Activities of Daily Living**

Likewise, Avvisato's self-reported activities of daily living suggested that she retained the capacity to perform some work. According to the ALJ:

> [Avvisato] manages her own personal care, lives independently at college, prepares simple meals using the microwave, does laundry, uses a computer, exercises, is a DJ for college radio station, goes to school full time, and traveled to Florida, New York, New Jersey, and France, albeit all with limitations (Exhibit 5E, 8E, Hearing Testimony). While none of these activities alone is dispositive, taken together they suggest that the claimant is capable of performing work activity on a sustained and continuous basis within the above parameters. The record supports the unskilled sedentary residual functional capacity. This level of activity is not consistent with someone alleging such severe and debilitating symptomatology.

(Tr. 42).

### D. **The Expert Opinion Evidence**

Given this clinical picture, and Avvisato's self-reported activities of daily living, six different medical experts opined regarding whether Avvisato's impairments were disabling. Five of these six medical experts determined based upon this evaluation that Avvisato retained the ability to perform some work notwithstanding her emotional and physical impairments.

With respect to her emotional conditions, two state agency experts opined that Avvisato retained the ability to work and faced only mild to moderate impairments. First, on November 7, 2019, Dr. Melissa Franks found that Avvisato was mildly impaired in her ability to adapt to the workplace and understand instructions and experienced only a moderate degree of impairment with respect to concentration and interacting with others. (Tr. 87). Dr. Franks also found that Avvisato was not

8

significantly impaired in multiple spheres of workplace activity. (Tr. 92-93). Dr. Arlene Rattan reached similar conclusions in October of 2020 following a reconsideration of Avvisato's disability claim. (Tr. 107-09).

Two state agency experts also opined that Avvisato retained the physical capacity to perform some work. At the outset, on November 7, 2019, Dr. Louis Bonita opined that Avvisato could perform light work notwithstanding her physical limitations. (Tr. 89-91). Upon reconsideration in October of 2020 Dr. Kurt Maas concluded that Avvisato was somewhat more restricted physically but found that she retained the ability to perform a limited range of light or sedentary work. (Tr. 104-09). Dr. Natalie Litvinsky, an independent expert, also responded to interrogatories posed by the ALJ on September 15, 2021. (Tr. 968-77).  Dr. Litvinsky also found that Avvisato retained the ability to work despite her physical and emotional impairments. (Id.)

In stark contrast to this medical consensus, one treating physician, Dr. Kathleen Sallavanti, stated in November of 2019 that Avvisato's impairments were totally disabling. (Tr. 838-44).

It was against this backdrop that Avvisato's disability claim came to be heard by the ALJ.

E. <u>**The ALJ Decision**</u>

On July 20, 2021, the ALJ conducted a hearing in Avvisato's case, at which

the plaintiff, her father and a vocational expert testified. (Tr. 52-83). Following the

hearing, on October 28, 2021, the ALJ issued a decision denying Avvisato's claim.

(Tr. 29-46). In that decision, the ALJ first concluded that Avvisato had not engaged

in substantial gainful activity since August 16, 2019, the application date. (Tr. 34).

At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found

that Avvisato had the following severe impairments: unspecified anxiety disorder,

psychological conversion disorder, social phobia unspecified, and congenital

anteversion of femur. (Id.)

The ALJ determined that Avvisato's ataxia was not a severe impairment,

noting that:

> [T]he claimant has the following non-severe impairments of cerebral
> atrophy, ataxia due to cerebral atrophy, tremor, myoclonus, and lack of
> coordination (Exhibit 15F). The record notes she has stable diffuse
> cerebellar atrophy without associated brainstem abnormality (Exhibit
> 15F/p. 7). Dr. Natalie Litvinsky, a board-certified neurologist who
> reviewed the record, stated that: "The claimant follows with neurology
> for tremor and abnormal gait (15F p. 4). She had extensive workup (15F
> p. 7) and has seen multiple specialists and no etiology was found."
> (Exhibit 19F, p. 1). Dr. Litvinsky suggested considering a diagnosis of
> conversion disorder (Exhibit 19F/p. 1). She further opined that, "There
> is no evidence that the claimant has a neurologic disorder. Her exam
> and functional findings and inconsistencies (15F p. 7, 12F p. 2). There
> are also contraindications in the history, such as endorsing struggling

with standing and walking but doing light jogging (15f p. 4). The claimant's brain MRI showing diffuse cerebellar atrophy and an arachnoid cyst does not explain her symptoms." (Exhibit 19f/p. 2).

The record does not demonstrate that any of these conditions cause any significant functional limitations or that they have lasted or are expected to last 12 months or more. Therefore, the undersigned finds that these impairments have no more than a minimal effect on the ability to do basic work activities and are considered "non-severe". The undersigned has reviewed and considered all severe and non-severe impairments when formulating the following residual functional capacity and, where appropriate has included limitations to address the claimant's non-severe impairments or subjective complaints.

(Tr. 35). In fact, the ALJ's decision, read as a whole, reveals that Avvisato's ataxia was considered throughout the RFC analysis. (Tr. 39-45).

At Step 3, the ALJ determined that Avvisato did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 35-38). Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Avvisato's impairments as reflected in the medical record, and found that:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 416.967(b) except she is limited to occupations that require no more than occasional postural maneuvers, such as balancing, stooping, or kneeling, crouching, or crawling and climbing on ramps and stairs, but she must avoid occupations that require climbing on ladders, ropes and scaffolds. She must avoid occupations that require pushing or pulling with the lower extremities to include the operation of pedals. She must avoid

occupations that require pushing and pulling with the upper extremities
to include the operation of hand levers. She is limited to occupations
which do not require exposure to hazards such as dangerous machinery
and unprotected heights or driving as part of the job duties. She is
limited to simple routine repetitive work, generally described as
unskilled, with no more than a specific vocational preparation (SVP) of
two and that is low stress, defined as only occasional decision making
required and only occasional changes in the work setting. She is limited
to occupations which require no more than occasional interaction with
supervisors and coworkers and no interaction with members of the
general public.

(Tr. 38-39).

In fashioning this RFC, the ALJ considered the clinical evidence, medical
opinions and Avvisato's activities of daily living. (Tr. 39-45). Further, in fashioning
the RFC, the ALJ considered the medical opinions and prior administrative medical
findings. In this regard, the ALJ concluded that the medical consensus that Avvisato
could perform some work was more persuasive that Dr. Sallavanti's extreme
opinion, but limited Avvisato to sedentary work in a low stress work environment.
As for Dr. Sallavanti's outlier opinion, the ALJ provided the following cogent
analysis of this opinion:

> The undersigned also considered the two opinions from Dr. Sallavanti
> (Exhibit 8F). In a treatment note, Dr. Sallavanti opined that the claimant
> will limit her driving because of her tremors and will use a cane for
> safety due to fall risk (Exhibit 8F/p. 4). The record further states the
> claimant has not been able to cook on a stove or carry hot items due to
> safety. Dr. Sallavanti stated that she agrees the claimant is not able to
> work but may carry a modified school schedule. The undersigned finds

this opinion is not persuasive. There is no full functional analysis but rather a statement the claimant cannot work, a decision reserved to the Commissioner. Regarding the portion where the doctor agreed to limit the claimant's driving and to use a cane for safety, it appears to be based at least in part of the claimant's self-report that she could not cook or carry hot items for safety reasons. More importantly, it is not persuasive for the same reasons that there is no support for another opinion from Dr. Sallavanti in a medical source statement dated November 26, 2019, wherein Dr. Sallavanti opined that the claimant cannot sustain full time work (Exhibit 8F/p. 6-12). In Dr. Sallavanti's Physical Residual Functional Capacity Assessment, she opined, among other unsupported limitations, that the claimant could work less than two hours in an eight-hour-day, needed a cane to ambulate, and needed to alternate between sitting and standing. Dr. Sallavanti's opinions are complete underestimates of the claimant's abilities and not consistent with the claimant's treatment notes from neurology at CHOP as previously discussed. Additionally, as Dr. Litvinsky noted, the claimant follows with neurology for tremors and abnormal gait, had extensive workups, and has seen multiple specialists but no etiology was found. Dr. Litvinsky also pointed out that a diagnosis of conversion disorder is considered (Exhibit 5F/p. 42, 46, 52; 15F/p. 5). The claimant reported that when she is out of stressful situations, her tremors stop (Exhibit 15F/p. 10). She manages her own personal care, lives independently at college, does laundry, uses a computer, exercises, is a DJ for college radio station, goes to school full time, and traveled to Florida, New York, New Jersey, and France, albeit all with limitations (Exhibit 5E, Hearing Testimony). The undersigned notes that the RFC gives the claimant every benefit of the doubt regarding hazards and driving. The record supports that she could perform sedentary work as outlined in the RFC assessment above.

(Tr. 44).

Having arrived at this RFC assessment, the ALJ concluded that there were jobs that existed in the significant numbers in the national economy that Avvisato

could perform and found that Avvisato had not met the exacting standard necessary to secure Social Security benefits. (Tr. 45-46).

This appeal followed. (Doc. 1). On appeal, Avvisato argues that the ALJ erred in failing to give controlling weight to Dr. Sallavanti's treating source opinion. This appeal is fully briefed and is, therefore, rip, for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

14

conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid</u>.; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence.

16

Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal

19

requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic

20

view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

21

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

The plaintiff filed this disability application after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of

fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant

the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence

for no reason or for the wrong reason.'" <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d

Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision

is accompanied by an adequate, articulated rationale, it is the province and the duty

of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without
> crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
> <u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); <u>Connors v.
> Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

## D.   <u>The ALJ's Decision is Supported by Substantial Evidence</u>.

In this setting, we are mindful that we are not free to substitute our

independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial

evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Avvisato retained the residual functional capacity to perform sedentary, simple, and routine work with the additional articulated limitations. Therefore, we will affirm this decision.

In this single-issue case involving the ALJ's rejection of a treating source opinion, we note that our review is cabined by the Social Security regulations' evolving standards regarding the evaluation of medical opinion evidence. As we have noted, after the paradigm shift in in the manner in which medical opinions are evaluated when assessing Social Security claims, "[t]he two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability,' [ ] [and] [a]n ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." <u>Andrew G. v. Comm'r of Soc. Sec.</u> at *5 (citing 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2)). But ultimately, provided that the decision is accompanied by an adequate, articulated rationale, examining these factors, it is the province and the

26

duty of the ALJ to choose which medical opinions and evidence deserve greater weight. Moreover, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009). Thus, our inquiry is not whether evidence existed from which the ALJ could have drawn a contrary conclusion, but rather whether substantial evidence existed in the record to support the ALJ's decision to credit or discredit each medical opinion, and whether the ALJ appropriately articulated his decision under the regulations.

Judged against these standards Avvisato's argument that we must afford controlling weight to the treating source opinion of Dr. Sallavanti fails for at least two reasons. First, to the extent that Avvisato relies upon the so-called treating source rule which in some instances compelled that a treating source opinion be given controlling weight, we are constrained to note that in 2017 the Commissioner expressly abandoned this treating source rule in favor of a more holistic analysis grounded upon consideration of the persuasiveness of all medical opinions. See Stamm v. Kijakazi, 577 F. Supp. 3d 358, 370 (M.D. Pa. 2021). Therefore, as a legal matter, Avvisato's reliance upon the now defunct treating source opinion rule is misplaced.

27

In addition, as a factual matter substantial evidence supported the ALJ's determination that Dr. Sallavanti's opinion lacked persuasive power. On this score, the ALJ may discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion, and the doctor's actual treatment notes, justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016).

In this case, the ALJ aptly observed that Dr. Sallavanti's opinion was inconsistent with the medical opinion consensus and Avvisato's treatment notes. Moreover, Avvisato's self-reported activities of daily living contradicted her claim of total disability. These were all legitimate factors to take into account when evaluating the opinion evidence and the ALJ's finding that Dr. Sallavanti's opinion was unpersuasive drew support from substantial evidence in this record.

In closing, the ALJ's assessment of the evidence in this case complied with

the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: June 24, 2024